| | |
|---|---|
| MARIO BOWLES #490357, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     NO. 3:22-cv-00032 |
| | ) |
| TENNESSEE DEPARTMENT OF | ) |
| CORRECTIONAL - CCA, at al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Mario Bowles filed this pro se civil rights case under 42 U.S.C. § 1983 while he was confined at Trousdale Turner Correctional Center (TTCC). He has since been transferred to Whiteville Correctional Facility (WCFA). The Court previously directed Plaintiff to resolve the filing fee and file an amended complaint. (Doc. No. 11). Plaintiff then filed two applications to proceed as a pauper (Doc. Nos. 14, 20), a motion to extend the fee deadline (Doc. No. 27), two amended complaints (Doc. Nos. 13, 16; Doc. No. 22),[1] and several miscellaneous filings. (Doc. Nos. 12, 15, 18, 21, 23–26, 28–29, 31–32). The Complaint is brought against the Tennessee Department of Correction (TDOC), CoreCivic, TTCC, WCFA, eighteen TTCC staff members, and thirty-five WCFA staff members. (Doc. No. 13 at 1–3; Doc. No. 16 at 3–5, 15). This case is

---

[1] On the docket for this case, Doc. No. 13 (a completed complaint form) is titled "Amended Complaint," and Doc. No. 16 (a lengthy handwritten pleading) is titled "Second Amended Complaint." These two documents, however, appear to have arrived at the Court on the same day (September 23) and in the same envelope. (See Doc. No. 13 at 1, 12–13 ("received" stamp and envelope); Doc. No. 16 (no separate "received" stamp or envelope)). Moreover, Doc. No. 13 appears as though it may incorporate Doc. No. 16 by reference. (See Doc. No. 13 at 1, 4). Accordingly, the Court considers Doc. Nos. 13 and 16 together as a single pleading. Doc. No. 22, meanwhile, is a subsequent pleading on another complaint form, but it incorporates Doc. No. 16 by reference (Doc. No. 22 at 4), while providing much less detail than the prior pleadings. The Court therefore considers Doc. Nos. 13 and 16 together as the operative complaint, and these two filings will be collectively referred to as the "Complaint" going forward.

before the Court for initial review of the Complaint and a ruling on the pending motions. As explained below, this case may continue for further development, and Plaintiff must consult the accompanying Order for instructions to follow for the case to proceed.

## I.  Applications to Proceed as a Pauper

An inmate may bring a civil suit without prepaying the filing fee. 28 U.S.C. § 1915(a). Both of Plaintiff's applications to proceed as a pauper, signed under penalty of perjury, reflect that he cannot pay the full filing fee in advance. (See Doc. Nos. 14, 20). Plaintiff has not submitted a certified copy of his inmate trust account statement, but he has submitted documentation reflecting that he has made a good faith effort to obtain it. (See Doc. No. 18-1 at 12 (copy of "Inmate Request Form" in which Plaintiff requested an "indigent inquiry form filled out for court and a 6 months average deposit confirming zero balance," and a WCFA staff member with an illegible signature responded, "we do not keep such forms on hand, you could try contacting education for this type of document"); Doc. Nos. 20-1, 20-2 (Plaintiff's signed statement that Case Manager Sain has ignored or refused Plaintiff's repeated requests to obtain a certified trust account statement)). Because it appears that Plaintiff may not be at fault for failing to obtain a copy of his trust account statement, the Court will grant Plaintiff's applications for pauper status (Doc. Nos. 14, 20) and assess the $350.00 filing fee as directed in the accompanying Order. 28 U.S.C. § 1915(b). If the Court later determines that Plaintiff's "allegation of poverty is untrue," however, then Court must dismiss the case. Id. § 1915(e)(2)(A). Plaintiff's motion for an extension of time to resolve the fee (Doc. No. 27) will be denied as moot.

## II.  Notices, Petitions, and Inquiries

Before reviewing the Complaint, the Court will address the collection of "notices," "petitions," and "inquiries" filed by the Plaintiff. (Doc. Nos. 12, 15, 18, 21, 23–26, 28–29, 31–34).

2

Through these filings, Plaintiff seems to be seeking to give the Court periodic updates of his conditions of confinement at WCFA.

Plaintiff is advised that these filings have no effect in this case, and the Court will not consider them as part of its initial review of the Complaint. Federal lawsuits are not litigated through advisory notices and updates of allegations. Defendants are only required to answer a plaintiff's "pleading," in the form of a complaint or amended complaint, which must set forth a plaintiff's entire statement of the claim against the defendants. See Fed. R. Civ. P. 3 (civil action commenced by filing complaint); Fed. R. Civ. P. 7(a) (limiting the types of permissible pleadings); Fed. R. Civ. P. 8(a) (requirements for a pleading that states a claim for relief); Fed. R. Civ. P. 8(b) (requirements for responding to a pleading). To change or add to the claims in a complaint, a plaintiff must file an amended complaint, in compliance with Federal Rule of Civil Procedure 15 and Middle District of Tennessee Local Rule 15.01. Any other request for relief by a party must be in the form of a proper motion that clearly states the relief sought and the grounds for seeking it. Fed. R. Civ. P. 7(b).

In short, the filings that Plaintiff calls notices, petitions, and inquiries, do not contribute to his litigation of this case, and Plaintiff should refrain from submitting similar filings going forward.

## III. Initial Review

The Court must review and dismiss the Complaint if it is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2)(B), 1915A; 42 U.S.C. § 1997e(c)(1). Because Plaintiff is representing himself, the Court must also hold the Complaint to "less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)).

3

## A.     Allegations

Liberally construing the Complaint and drawing all reasonable inferences in Plaintiff's favor, the Court has established the following summary of factual allegations that are potentially relevant to the named Defendants. The Court notes, however, that the Complaint includes many allegations that are unsupported by facts and/or unconnected to a named Defendant. Although some of these conclusory or irrelevant allegations may be included in this summary for context, many others will not be included, as they do not form the basis of a viable claim in this case. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citations and quotation marks omitted) ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.").

### 1.     Events at TTCC

On April 9, 2021, Plaintiff arrived at TTCC. (Doc. No. 16 at 6). Fearing for his safety, Plaintiff refused to be transferred to the main compound because, as he told staff members at intake, he had been mistaken for a gang member who was a "known hit-man on [the] street," had cooperated with law enforcement, and "had a hit on him for a lot of money." (Id.).

On May 21, 2021, Case Manager Jackson told Plaintiff to go to the main compound. (Id.). Plaintiff refused and tried to explain the danger of doing so. (Id.). Several TTCC staff members arrived (Lt. Edmond Hill, Lt. Murray, Officer Rowe, and Officer Moore), handcuffed Plaintiff, and took him to a housing unit in the main compound. (Id.). The unit manager told the staff members to take Plaintiff to segregation, but they refused, forced Plaintiff in a cell, removed the handcuffs, and locked Plaintiff in the cell. (Id.). A group of twenty-five gang members came to Plaintiff's cell, intending to kill him. (Id. at 7, 18). Some other inmates screamed, "That's not

4

him!" and an officer assisted Plaintiff. (Id. at 7). Case Manager Smith obtained Plaintiff's TOMIS

ID number and sent him to speak with Case Manager Mathews in an office. (Id.). Mathews looked

up Plaintiff's information and found that he had an incompatible and a note "that some gang

bangers had a green light on [Plaintiff's] head." (Id.). Jackson then told Plaintiff to go back to his

original housing off the main compound. (Id.). When Plaintiff returned to his prior cell, he found

that all of his personal property had been stolen, including clothes, electronics, books, commissary

items, religious materials, legal materials, mail, and family photographs. (Id.).

On May 28, 2021, Case Manager Jackson and other TTCC staff members attempted to put

another inmate in Plaintiff's cell, but Plaintiff refused. (Id.). Jackson took Plaintiff to segregation,

and because she was angry at Plaintiff, she retaliated against Plaintiff by not allowing him to bring

his television or commissary items. (Id.).

On June 11, 2021, Lt. Hill, Lt. Hawkins, and Officer Dicky again tried to force Plaintiff to

return to the main compound. (Id. at 7, 19). Plaintiff refused, claiming that such a transfer would

put his life in danger. (Id. at 19). And in retaliation for Plaintiff filing grievances, Hill and Hawkins

fabricated write-ups that prevented Plaintiff from being placed on protective custody and forced

him to remain at TTCC, while Hill and Officer Ottis took Plaintiff's commissary items. (Id.).

On July 26, 2021, Lt. Hill tried to force an "unauthorized inmate" into Plaintiff's cell, and

Plaintiff refused. (Id.). Hill then choked Plaintiff nearly to death, slammed him on the floor, and

threatened to kill Plaintiff if he wrote another grievance on Hill. (Id. at 7, 19). Plaintiff suffered

neck swelling, back pain, head pain, and difficulty swallowing. (Id. at 19). He did not receive

medical treatment. (Id.)

On August 6 or 7, 2021, Lt. Hill forced another inmate into Plaintiff's cell. (Id.) Plaintiff

and his cellmate argued until August 13, when the cellmate told Hill that he would not be Hill's

"puppet to hurt [Plaintiff]." (Id.). Hill, in a state of "emotional madness," choked Plaintiff (who was in handcuffs) on a sink, pulled Plaintiff to the middle of the pod, and slammed Plaintiff headfirst on the floor. (Id. at 7, 19). Hill then pushed Plaintiff to another cell hard enough that Plaintiff fell again. (Id. at 19). Plaintiff suffered injuries to his abdominal area, head, neck, back, elbows, and knees. (Id. at 7, 19). Contract Monitor Brun and Captain Beaver saw this occur and did nothing, and then refused to obtain medical care for Plaintiff. (Id.).

### 2.      Transfer to WCFA

After months of hardship at TTCC, Plaintiff filed this lawsuit in January 2022, naming several TTCC staff members as Defendants. (Id. at 3, 8–9). In retaliation, on the morning of February 1, 2022, TTCC staff members (including Captain Mitchell, Case Manager Smith, and Case Manager Mathews) told Plaintiff he was being transferred to WCFA. (Id. at 3, 9). Without being aggressive, Plaintiff refused this transfer because of a prior conflict with gangs at WCFA. (Id.). The staff members sprayed Plaintiff with mace, aggressively pushed him, punched him in the ribs, and dragged him to the bus to be taken to WCFA. (Id.). Plaintiff was in serious pain from injuries to his arm, head, and neck. (Id.). Contract Monitor Brun appeared on the scene, failed to obtain medical treatment for Plaintiff, and approved the transfer to WCFA. (Id.). Plaintiff also alleges that Assistant Warden Norman "showed deliberate indifference" at this time. (Id. at 9).

### 3.      Events at WCFA

Plaintiff arrived at WCFA on the afternoon of February 1, 2022. (Id.). At intake, he told Property Room Officer Robinson and Officer Scott he should not be on the main compound. (Id.). Plaintiff remained off the main compound for one month, and during that time, he told several other staff members it was dangerous for him to be at WCFA, including Unit Manager Neal and Case Manager Sain. (Id.).

6

On March 2, 2022, Plaintiff was told to go to the main compound or be taken to segregation. (Id.). Plaintiff refused, and Captain Vick Huderson and Case Manager Edward threatened to spray Plaintiff with mace if he did not go. (Id. at 9, 20). Plaintiff told Edwards to take him to segregation. (Id. at 9–10). On the way to segregation, Unit Manager Neal convinced Plaintiff to go to the main compound, but Plaintiff changed his mind when Officer Hernandez threatened Plaintiff and Plaintiff noticed a group of inmates waiting for Plaintiff in the main compound. (Id. at 10, 20). Plaintiff alleges that Edward brought those inmates "to get [Plaintiff]." (Id. at 10). Neal then sent Plaintiff to segregation. (Id.). That night, Neal brought Plaintiff "seg[regation] rule sheets and small pieces of property allowed in seg[regation]." (Id.). Over the remainder of March, Plaintiff submitted numerous grievances or oral complaints to Chief Assistant Williams, Contract Monitor Hill, and Captain Williams, and they did not provide a "professional response." (Id. at 21).

From April 1 to 12, 2022, Captain Huderson, Officer Rowe,[2] and Lt. Warren forced Plaintiff to share a cell with other inmates by threatening Plaintiff with mace, and Plaintiff had conflicts with these cellmates. (Id. at 10, 21). On April 12, Warren threatened to mace Plaintiff if he did not let a gang-affiliated inmate into his cell. (Id. at 10). Plaintiff, who had PTSD from prior mace incidents and had "been off his meds for months," had a panic attack and asked Rowe for mental health services. (Id. at 10, 21). Plaintiff told Rowe he was going to "blank out on PTSD." (Id. at 10). Rowe laughed, mocked Plaintiff, and said that mental health would not come unless Plaintiff was going to harm himself. (Id.). To get help, Plaintiff said he was going to harm himself. (Id.). An hour after Plaintiff requested treatment, Rowe called mental health services. (Id. at 21).

Plaintiff was in seclusion on "mental health watch" from April 12 to July 28, 2022. (Id. at 10). At intake, Plaintiff heard mental health Nurse Craig say he was going to put Plaintiff on

---

[2] Plaintiff alleges that the same Officer Rowe who worked at TTCC also worked at WCFA. (See Doc. No. 16 at 10).

medication to make Plaintiff crazy, so Plaintiff did not allow Craig to prescribe him medication. (Id. at 11, 21). Dr. Kirk also allegedly showed less concern for Plaintiff's mental health than inmates of other races. (Id.). During this time, Plaintiff allegedly experienced a wide range of unconstitutional conduct, including "hate crime" by property room Officers Robinson and Lewis, threats from Officers Cleaves, Williams and Mask, and food and mail tampering. (Id.).

On June 15, 2022, Lt. Morris, Lt. Warren, and Captain Huderson took Plaintiff's legal materials while he was being moved to segregation. (Id. at 11). Warren claimed that she put these materials in her office, but Plaintiff has not seen them since that day. (Id.). Plaintiff's new cell was unsanitary, with "vomit on [the] toilet" and a wet floor that smelled like urine. (Id.). This caused Plaintiff's feet to burn and swell for weeks. (Id.). Plaintiff filled out a sick call request, but he was not taken to medical. (Id.). On June 27, 2022, Plaintiff was taken back to intake. (Id.).

On July 6, 2022, after speaking to property room Officer Robinson, Captain Huderson told Plaintiff to "cuff up" and go to his old segregation cell to see a doctor. (Id.). Plaintiff refused because the doctor had previously informed Plaintiff that he would be back to see Plaintiff. (Id.). Plaintiff then agreed to go if Huderson called the doctor to confirm. (Id.). Huderson got angry, knocked a food tray out of Plaintiff's hand, pushed Plaintiff into the middle of the cell, and sprayed Plaintiff's "private area" with mace. (Id.). Huderson then forced Plaintiff back to his old segregation cell, leaving Plaintiff's skin burning for hours. (Id.). Medical checked on Plaintiff and said that Huderson was supposed to move another inmate, not Plaintiff. (Id. at 12). The next day, Huderson threatened to mace Plaintiff if Plaintiff did not allow Huderson to "take photos of [Plaintiff] with [Huderson's] personal phone." (Id.). Due to Plaintiff's PTSD, he agreed. (Id.).

From July 8 to 16, 2022, Plaintiff was "consistently threaten[ed]" by inmates. (Id. at 21). Based on these threats, Plaintiff sent mental health services a list of inmates for separation. (Id.).

On July 16, 2022, Officer Harris gave an inmate Plaintiff's list of names for separation, resulting in numerous additional threats to Plaintiff. (Id.).

On July 18, 2022, Plaintiff was forced to take a drug test while Officers J. Jones and Harris waited because Plaintiff was observed gagging and having mucus attacks when he was served food. (Id. at 22). Plaintiff's reaction was due to allergies, as he does not do drugs. (Id. at 12).

On July 28, 2022, Plaintiff filed a grievance. (Id. at 22). Two days later, in retaliation for the grievance, Officer Ammus made threats regarding Plaintiff to other inmates, gave Plaintiff a cold meal tray, and did not allow Plaintiff to go outside for recreation. (Id. at 12, 22).

At some point in July 2022, Officers Rowe and Love lied about Plaintiff to bring him harm. (Id. at 12, 21–22). Rowe also threatened Plaintiff, while Love helped steal Plaintiff's commissary and gave Plaintiff a tray with meat juice on it. (Id. at 12, 22). Officer Wilson refused to give Plaintiff breakfast twice and threatened him at the showers. (Id. at 12). And Officer J. Jones allowed another inmate to switch breakfast trays with Plaintiff. (Id.).

On August 8, 2022, Plaintiff refused a meal tray, Officer J. Jones refused to replace it, and Plaintiff said he would report J. Jones. (Id.). In retaliation, J. Jones' cousin (another Officer Jones) ordered another officer to give Plaintiff a half full meal tray with "sour odors." (Id.).

On August 30, 2022, Officer Jones deprived Plaintiff of recreation and threatened him "in a slick manner" by repeatedly telling Plaintiff not to complain. (Id. at 22).

At some point in August 2022, Officers Love, Rowe, Harris, and J. Jones blocked Plaintiff from using the phone when he had a scheduled family call following his mother's release from the hospital and a death in the family. (Id. at 12, 22). Plaintiff, instead, only briefly spoke with his mother and nephew. (Id. at 22).

In September 2022, Plaintiff submitted several sick call requests due to not receiving a bed mat, and he gave a grievance to a night shift officer. (Id. at 12–13, 22). Plaintiff did not receive a response. (Id. at 13, 22).

On September 12, 2022, Lt. Warren told another inmate that Plaintiff is a "b*t*h a**," and that she would "roll [Plaintiff] up out of here" four days later. (Id. at 22).

At the time Plaintiff filed the Complaint in September 2022, he did not have a mat for his bed, his personal property, or his legal materials. (Id. at 12–13).

### 4.    This Lawsuit

Plaintiff filed this case in January 2022. On two occasions, this case was dismissed without prejudice for Plaintiff's failure to resolve the filing fee and follow the Court's Orders, but both times, the case was reopened because it appeared that Plaintiff's failure to act may have been outside of his control. The Court eventually received the operative Complaint on September 23, 2022. Plaintiff requests monetary damages and transfer to protective custody at a federal prison. (Doc. No. 13 at 5; Doc. No. 16 at 24–25).

### B.    Standard of Review

To determine if the Complaint states a claim upon which relief may be granted, the Court applies the same standard as under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Hill v. Lappin, 630 F.3d 468, 470–71 (6th Cir. 2010). The Court therefore accepts "all well-pleaded allegations in the complaint as true, [and] 'consider[s] the factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief.'" Williams v. Curtin, 631 F.3d 380, 383 (6th Cir. 2011) (quoting Iqbal, 556 U.S. at 681). An assumption of truth does not extend to legal conclusions or "'naked assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007)).

## C. Analysis

"There are two elements to a § 1983 claim. First, a plaintiff must allege that a defendant acted under color of state law. Second, a plaintiff must allege that the defendant's conduct deprived the plaintiff of rights secured under federal law." <u>Handy-Clay v. City of Memphis, Tenn.</u>, 695 F.3d 531, 539 (6th Cir. 2012) (citations omitted).

### 1. Allegations Untied to a Named Defendant

As an initial matter, Plaintiff fails to state a claim based on allegations that are not connected to a named Defendant. This is a natural consequence of the language of Section 1983, which requires "an actual connection or link between the actions of the Defendants and the deprivation alleged to have been suffered by Plaintiff." <u>Rood v. Sec'y of CDCR</u>, No. 1:22-cv-00449, 2022 WL 2160662, at *3 (E.D. Cal. June 15, 2022) (citing <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 691, 695 (1978)). Some allegations mentioned above that are not linked to a named Defendant include: the confiscation of Plaintiff's property at TTCC in May 2021; the conditions of confinement while Plaintiff was on mental health watch at WCFA from April to July 2022; the conditions of confinement during Plaintiff's twelve-day stay in segregation at WCFA in June 2022; and the conditions of confinement at WCFA when Plaintiff filed the Complaint in September 2022, including his lack of a sleeping mat, personal property, and legal materials. Accordingly, Plaintiff may not pursue claims based on these allegations at this time.

### 2. Improper Parties

Plaintiff names TDOC, TTCC, and WCFA as Defendants, but they are not proper parties to this case. "The TDOC is not a "person" within the meaning of [Section] 1983, and is therefore not a proper defendant." <u>Hix v. Tenn. Dep't of Corr.</u>, 196 F. App'x 350, 355 (6th Cir. 2006) (quoting <u>Will v. Mich. Dep't of State Police</u>, 491 U.S. 58, 64 (1989)). Similarly, TTCC and WCFA

are buildings, and as such, they are not persons or legal entities subject to suit under Section 1983. See McIntosh v. Camp Brighton, No. 14-CV-11327, 2014 WL 1584173, at *2 (E.D. Mich. Apr. 21, 2014) (collecting cases establishing that a prison facility "is not a 'person' or legal entity subject to suit under 42 U.S.C. § 1983"). These three Defendants will be dismissed as parties.

The Court notes, however, that Plaintiff also brings this case against CoreCivic—the private entity contracted to manage both TTCC and WCFA[3]—and CoreCivic is a proper party to a Section 1983 case. See Street v. Corr. Corp. of Am., 102 F.3d 810, 814 (6th Cir. 1996). Plaintiff's claims against CoreCivic will be discussed below, following the analysis of his claims against the individual defendants.

### 3. Insufficient Allegations of Wrongdoing

Plaintiff lists several individuals as Defendants while providing no factual explanation of how that individual personally violated his rights. That is, after naming them as Defendants, Plaintiff does not reference eleven individuals in the body of the Complaint: TTCC Defendant Steinburg and WCFA Defendants West, Hill (the Mail Room Officer), Kristy, McVey, Wilkes, Brown, Steven, Wade, Powell, and Harris (the Commissary Officer). Even under the liberal standards for reviewing pro se filings, that is insufficient to state a claim. See Gilmore v. Corr. Corp. of. Am., 92 F. App'x 188, 190 (6th Cir. 2004) (citing Flagg Bros. v. Brooks, 436 U.S. 149, 155–57, (1978)) ("Merely listing names in the caption of the complaint and alleging constitutional violations in the body of the complaint is not enough to sustain recovery under [Section] 1983.").

---

[3] The Court takes judicial notice of this fact. See Trousdale Turner Correctional Center, TENNESSEE DEPARTMENT OF CORRECTION, https://www.tn.gov/correction/sp/state-prison-list/trousdale-turner-correctional-center; Whiteville Correctional Facility, TENNESSEE DEPARTMENT OF CORRECTION https://www.tn.gov/correction/sp/state-prison-list/whiteville-correctional-facility; Fed. R. Evid. 201(b) (allowing judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

Plaintiff also makes allegations against several Defendants that do not plausibly reflect a violation of his constitutional rights, either because they are legal conclusions or undeveloped allegations of general harassment. This includes: the June 2021 attempted cell transfer at TTCC by Defendants Hill, Hawkins, and Dicky; TTCC Defendant Hunt's undated and unspecified involvement in Plaintiff's "forced RCA status" and commissary restriction (Doc. No. 16 at 20); informing WCFA Defendant Scott that Plaintiff should not be on the main compound when he arrived at WCFA on February 1, 2022; unspecified threats by WCFA Defendant Hernandez during Plaintiff's cell transfer in March 2022; acts by named Defendants while Plaintiff was on mental health watch at WCFA from April to July 2022, including the "hate crime[s]" by Defendants Robinson and Lewis and unspecified threats by Defendants Cleaves, Officer Williams, Mask, and Robinson; WCFA Defendant Robinson's July 2022 conversation with another WCFA Defendant prior to a use of force against Plaintiff; the actions of WCFA Defendants Love and Rowe in July 2022, including lying about Plaintiff, threatening him, stealing his commissary, and giving him a tray with meat juice; WCFA Defendant J. Jones allowing another inmate to switch food trays with Plaintiff in July 2022; and WCFA Defendant Wilson threatening Plaintiff at the showers in July 2022. Such purely conclusory assertions of legal liability or general allegations of harassment are insufficient to state a claim for relief. See Gilmore, 92 F. App'x at 190 (citing Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988)) ("A complaint must contain allegations respecting all the elements to sustain a recovery under some viable legal theory."); Johnson v. Unknown Dellatifa, 357 F.3d 539, 546 (6th Cir. 2004) (citing Ivey v. Wilson, 832 F.2d 950, 954–55 (6th Cir. 1987)) ("[H]arassment and verbal abuse, such as Johnson has described,[4] do

---

[4] The non-actionable allegations of harassment in Johnson included a prison official continuously banging and kicking on a prisoner's cell door, "throw[ing] his food trays through the bottom slot of his cell door so hard that the top flies off, mak[ing] aggravating remarks to him, mak[ing] insulting remarks about his hair being too long, growl[ing] and snarl[ing] through his window, smear[ing] his window to prevent him from

not constitute the type of infliction of pain that the Eighth Amendment prohibits."). Plaintiff makes no other allegations of wrongdoing against nine of these Defendants (TTCC Defendants Dicky and Hunt, and WCFA Defendants Scott, Hernandez, Lewis, Cleaves, Officer Williams, Mask, and Robinson). These nine Defendants will be dismissed as parties.

Plaintiff also brings this case against six individuals whose only alleged participation is ignoring alleged wrongdoing by subordinates (TTCC Defendants, Kaizer, and Norman) or failing to properly respond to complaints and grievances (TTCC Defendant Lopez and WCFA Defendants Captain Williams, Chief Assistant Williams, Contract Monitor Hill). But "[t]he 'denial of administrative grievances or the failure to act' by prison officials does not subject supervisors to liability under § 1983." See Grinter v. Knight, 532 F.3d 567, 576 (6th Cir. 2008) (quoting Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999)). Similarly, "claims premised on the mishandling of [] grievances" are subject to dismissal because prisoners "have no constitutional right to an effective prison grievance procedure." Hursey v. Anderson, No. 16-1146, 2017 WL 3528206, at *2 (6th Cir. Mar. 31, 2017) (citation omitted). Accordingly, Plaintiff fails to state a claim against these six Defendants.

### 4. Events at TTCC

#### a. May 2021 Transfer to the Main Compound

Plaintiff alleges that, on May 21, 2021, several TTCC Defendants were involved in an effort to transfer Plaintiff to the main compound. Prior to this transfer, Plaintiff had informed prison officials that his life would be in danger on the main compound because his identity had been mistaken for a gang-affiliated inmate who had cooperated with law enforcement and "had a hit on him for a lot of money." And when Plaintiff was placed in a cell on the main compound,

---

seeing out of it, behav[ing] in a racially prejudicial manner toward him and jerk[ing] and pull[ing] him unnecessarily hard when escorting him from his cell." 357 F.3d at 545.

twenty-five gang members came to his cell intending to kill him. A non-Defendant officer assisted Plaintiff, and Plaintiff was eventually allowed to return to his cell away from the main compound.

These allegations state a non-frivolous claim for relief. The Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." Westmoreland v. Butler Cnty., Kentucky, 29 F.4th 721, 726 (6th Cir. 2022) (quoting Farmer v. Brennan, 511 U.S. 825, 833 (1994))). To state a claim for a violation of this duty, a plaintiff must show that, "'objectively,' he was 'incarcerated under conditions posing a substantial risk of serious harm.'" Reedy v. West, 988 F.3d 907, 912 (6th Cir. 2021) (quoting Farmer, 511 U.S. at 834). The plaintiff must also show that, subjectively, "the official acted with 'deliberate indifference' to inmate safety, meaning the official was 'subjectively aware of the risk' and 'fail[ed] to take reasonable measures to abate it.'" Id. (quoting Farmer, 511 U.S. at 829, 834, 847).

Accepting the factual allegations as true, Plaintiff may proceed with a failure-to-protect claim arising from this incident against Case Manager Jackson, Lt. Hill, Lt. Murray, Officer Rowe, and Officer Moore. Plaintiff satisfies the objective component by alleging that inmates on the main compound mistook him for an informant with a bounty on his head. And Plaintiff satisfies the subjective component against the staff members who directed (Jackson) or carried out (Hill, Murray, Rowe, and Moore) the transfer after Plaintiff explained the substantial risk of serious harm facing him on the main compound—a risk allegedly manifest by a group of twenty-five inmates congregating outside his cell to kill him, before a non-Defendant officer intervened and Plaintiff eventually returned to his prior cell.

### b. May 2021 Placement in Segregation

Plaintiff alleges that, on May 28, 2021, Case Manager Jackson placed Plaintiff in segregation for an unspecified period of time after he refused another inmate being placed in his

cell. Plaintiff also alleges that Jackson retaliated against Plaintiff by not allowing him to bring his television or commissary items to segregation.

These allegations fail to state a claim. A prisoner does not have "a constitutional right to choose his cellmates." McCain v. Jackson, No. 1:19-CV-234, 2019 WL 2075959, at *5 (S.D. Ohio May 10, 2019), report and recommendation adopted, 2019 WL 6485692 (S.D. Ohio Dec. 3, 2019) (citations omitted). Plaintiff, therefore, fails to state a claim based on the placement (or attempted placement) of another inmate in his cell. And because refusing a cellmate is not a constitutionally protected activity, he also fails to state a claim against Jackson for allegedly retaliating against him afterwards. See Hill, 630 F.3d at 472 (citing Thaddeus-X v. Blatter, 175 F.3d 378, 394–95 (6th Cir. 1999)) ("The first element that [a prisoner] must establish for his retaliation claim is that he was engaged in conduct protected by the First Amendment.").

Finally, to the extent that Plaintiff intends to bring a due process claim based on his transfer to segregation, he does not satisfy the threshold element of establishing a constitutionally protected liberty interest. See Pickelhaupt v. Jackson, 364 F. App'x 221, 224 (6th Cir. 2010) (citing Wilkinson v. Austin, 545 U.S. 209, 224 (2005)) ("[T]he question of what process is due is relevant only if the inmate establishes a constitutionally protected interest."). Prisoners have a liberty interest in avoiding confinement that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Wilkinson, 545 U.S. at 223 (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)). Courts consider "the nature of the more-restrictive confinement and its duration in determining whether it imposes an atypical and significant hardship." Harden-Bey v. Rutter, 524 F.3d 789, 793 (6th Cir. 2008) (internal quotation marks omitted) (collecting cases). Here, Plaintiff does not describe the nature of the conditions in segregation, or the duration of his stay there on this occasion. Accordingly, Plaintiff fails to state

a due process claim on this basis. See Joseph v. Curtin, 410 F. App'x 865, 868 (6th Cir. 2010) (internal citations and quotation marks omitted) ("[A]dministrative segregation alone does not involve an atypical and significant hardship implicating a protected liberty interest.").

### c.     June 2021 Fabricated Write-Ups and Taking of Commissary

Plaintiff alleges that, in June 2021, Lt. Hill and Lt. Hawkins fabricated write-ups that prevented Plaintiff from being placed on protective custody and forced him to remain at TTCC, and Hill and Officer Ottis took Plaintiff's commissary items, both in retaliation for Plaintiff filing grievances.

These allegations fail to state a claim. A bare allegation of fabricated write-ups does not support a stand-alone claim under Section 1983. See Dixon v. Brown, 38 F.3d 379, 379 (8th Cir. 1994) ("Although the filing of a false disciplinary charge is not itself actionable under § 1983, the filing of a disciplinary charge becomes actionable if done in retaliation for the inmate's filing of a grievance."). The alleged taking of Plaintiff's commissary items was an "unauthorized, intentional deprivation of [his] property," which "does not give rise to a due process claim if the state provides an adequate post-deprivation remedy." See Weatherspoon v. Woods, No. 16-1277, 2017 WL 3923335, at *3 (6th Cir. Feb. 24, 2017) (citing Hudson v. Palmer, 468 U.S. 517, 533 (1984); Parratt v. Taylor, 451 U.S. 527, 541 (1981)). Tennessee provides such a remedy, McMillan v. Fielding, 136 F. App'x 818, 820 (6th Cir. 2005) (citing Brooks v. Dutton, 751 F.2d 197, 199 (6th Cir. 1985)), and Plaintiff does not allege that he attempted this remedy or that the remedy was inadequate. Finally, Plaintiff's allegation of a retaliatory motive is not supported by any direct or circumstantial facts, such as "disparate treatment of similarly situated individuals or [a close] temporal proximity between" his filing of unspecified grievances and the alleged write-ups and taking of commissary. See Hill, 630 F.3d at 475–76 (citing Thaddeus-X, 175 F.3d at 394). Such "conclusory allegations

17

of retaliatory motive unsupported by material facts [are not] sufficient to state a . . . claim." See Hill, 630 F.3d at 475 (quoting Harbin-Bey v. Rutter, 420 F.3d 571, 580 (6th Cir. 2005)).

### d.    July 2021 Use of Force

Plaintiff alleges that, after he refused a cellmate on July 26, 2021, Lt. Hill choked Plaintiff, slammed Plaintiff on the floor, and threatened to kill Plaintiff if he filed another grievance concerning Hill. As a result, Plaintiff allegedly suffered neck swelling, back pain, head pain, and difficulty swallowing.

These allegations state two non-frivolous claims against Lt. Hill. First, the Eighth Amendment establishes the right for prisoners to be free from excessive force by prison officials. Burgess v. Fischer, 735 F.3d 462, 472 (6th Cir. 2013) (citing Whitley v. Albers, 475 U.S. 312, 318–22 (1986)). This claim has objective and subjective components. Cordell v. McKinney, 759 F.3d 573, 580 (6th Cir. 2014) (citing Santiago v. Ringle, 734 F.3d 585, 590 (6th Cir. 2013)). For the objective component, a plaintiff must demonstrate that a prison official inflicted pain that was "sufficiently serious" based on "contemporary standards of decency." Id. at 585 (quoting Williams v. Curtin, 631 F.3d 380, 383 (6th Cir. 2011)). The subjective component requires the Court to consider whether the alleged force applied by a prison official was "in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 580 (quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992)). Accepting Plaintiff's allegations as true, Plaintiff may proceed with an excessive force claim against Hill based on this incident.

Second, these allegations also support a retaliation claim against Lt. Hill. "[R]etaliation for the exercise of constitutional rights is itself a violation of the Constitution." Thaddeus-X, 175 F.3d at 394 (footnote omitted). To establish a retaliation claim, "a prisoner must prove that (1) he engaged in protected conduct, (2) the defendant took an adverse action that is capable of deterring

18

a person of 'ordinary firmness from continuing to engage in that conduct,' and (3) 'the adverse action was motivated at least in part by the [prisoner's] protected conduct.'" Hill, 630 F.3d at 472 (quoting Thaddeus-X, 175 F.3d at 394, 398). Here, for the purpose of initial review, (1) Plaintiff's filing of one or more grievances against Hill in the past was protected conduct, see id.; (2) Hill's use of force and threat to kill Plaintiff could deter a reasonable person from filing a grievance; and (3) Hill's alleged threat was explicitly tied to Plaintiff's protected conduct. Accordingly, Plaintiff may proceed with a retaliation claim against Hill based on this incident.

### e.    August 2021 Use of Force

Plaintiff alleges that, after he argued with an inmate forced into his cell by Lt. Hill on August 13, 2021, Hill choked and slammed Plaintiff headfirst on the floor while Plaintiff was in handcuffs. Contract Monitor Brun and Captain Beaver allegedly saw this assault and did nothing, and then refused to obtain medical care for Plaintiff.

Accepting these allegations as true, they state another excessive force claim against Lt. Hill. See Cordell, 759 F.3d at 583 (citing United States v. Graham, 275 F.3d 490, 511 n.11 (6th Cir. 2001)) (noting that force used on a handcuffed or otherwise incapacitated individual is less likely to be in good faith).

These allegations also state two non-frivolous claims against Contract Monitor Brun and Captain Beaver. First, the Eighth Amendment's requirement that prison officials "take reasonable measures to guarantee the safety of the inmates" means that an official may be liable for failing to prevent another official from harming an inmate. Curry v. Scott, 249 F.3d 493, 506 (6th Cir. 2001) (quoting Farmer, 511 U.S. at 832). To state a claim under this theory of relief, a prisoner must show that the official "acted with 'deliberate indifference' to a substantial risk that [another prison official] would cause [the prisoner] serious harm." Id. (collecting cases). Accepting Plaintiff's

allegations as true, Plaintiff may pursue claims against Brun and Beaver for failing to protect him from Lt. Hill's alleged use of force in August 2021.

Second, the Eighth Amendment is also "violated when prison doctors or officials are deliberately indifferent to [a] prisoner's serious medical needs." Richmond v. Huq, 885 F.3d 928, 937 (6th Cir. 2018) (quoting Comstock v. McCrary, 273 F.3d 693, 702 (6th Cir. 2001)). "A constitutional claim for deliberate indifference contains both an objective and a subjective component. The objective component requires a plaintiff to show the existence of a 'sufficiently serious' medical need." Dominguez v. Corr. Med. Servs., 555 F.3d 543, 550 (6th Cir. 2009) (quoting Farmer, 511 U.S. at 834). "The subjective component, in contrast, requires a plaintiff to 'allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk.'" Id. (quoting Comstock, 273 F.3d at 703). At this stage in the proceedings, it is reasonable to infer that Plaintiff's medical needs following the use of force by Lt. Hill were sufficiently serious (Plaintiff alleges injuries to his abdominal area, head, neck, back, elbows, and knees). And by alleging that Contract Monitor Brun and Captain Beaver refused Plaintiff medical care despite observing him in obvious distress, it is also reasonable to infer that these Defendants knew of and disregarded Plaintiff's medical needs. Accordingly, Plaintiff may pursue a claim of deliberate indifference to serious medical needs against Brun and Beaver arising from Hill's alleged use of force in August 2021.

### f.      February 2022 Use of Force and Transfer to WCFA

Plaintiff alleges that, on February 1, 2022, he was transferred to WCFA in retaliation for filing this case in January 2022. The TTCC Defendants who informed Plaintiff of the transfer were Captain Mitchell, Case Manager Smith, and Case Manager Mathews. Plaintiff attempted to refuse

20

this transfer because of prior conflicts with gang-affiliated inmates at WCFA. In response, the TTCC Defendants sprayed Plaintiff with mace, aggressively pushed him, punched him in the ribs, and dragged him to the bus to be taken to WCFA. Contract Monitor Brun appeared on the scene, failed to obtain medical treatment for Plaintiff, and approved the transfer to WCFA.

Plaintiff states three claims based on these allegations. First, he states a retaliation claim against the Defendants who initiated or approved the transfer. To restate, a retaliation claim requires that (1) a prisoner engaged in protected conduct, (2) a defendant took a sufficiently adverse action to deter that conduct, and (3) the adverse action was motivated at least in part by the protected conduct. See Hill, 630 F.3d at 472. Here, for the purpose of initial review: (1) filing this lawsuit was protected conduct, see Eckerman v. Tenn. Dep't of Safety, 636 F.3d 202, 208 (6th Cir. 2010) (citing Thaddeus-X, 175 F.3d at 396); (2) Plaintiff's transfer to WCFA was an adverse action because it would plausibly result in foreseeable, negative consequences based on Plaintiff's alleged prior conflicts with gang members at WCFA, see Hill, 630 F.3d at 474 (citing Siggers-El v. Barlow, 412 F.3d 693, 701–02 (6th Cir. 2005)) ("[A] prison transfer . . . can be an adverse action if that transfer would result in foreseeable, negative consequences to the particular prisoner."); and (3) there was a plausible retaliatory motive and close temporal proximity between the filing of this lawsuit and Plaintiff's transfer. See Maben v. Thelen, 887 F.3d 252, 268 (6th Cir. 2018) (quoting King v. Zamiara, 680 F.3d 686, 695–96 (6th Cir. 2012)) ("This Court has 'previously considered the temporal proximity between protected conduct and retaliatory acts as creating an inference of retaliatory motive.'"). Plaintiff, therefore, may pursue a retaliation claim against Captain Mitchell, Case Manager Smith, Case Manager Mathews, and Contract Monitor Brun based on this incident.

Second, and again accepting Plaintiff's allegations as true, Plaintiff may proceed with an excessive force claim against the Defendants who maced, pushed, punched, and dragged Plaintiff

after he refused the transfer to WCFA: Captain Mitchell, Case Manager Smith, and Case Manager Mathews.

Third, Plaintiff also states a claim of deliberate indifference to serious medical needs against Contract Monitor Brun for his alleged denial of medical treatment following the use of force. Plaintiff alleges that this force resulted in serious pain and injuries to his arm, head, and neck. For the purpose of initial review, it is reasonable to infer that Plaintiff's medical needs at this time were sufficiently serious, and that Brun knew of and disregarded Plaintiff's needs by observing Plaintiff's condition and denying him treatment.

### 5.   Events at WCFA

#### a.   March 2022 Placement in Segregation

Plaintiff alleges that, on March 2, 2022, Captain Huderson and Case Manager Edward threatened to mace him if he did not go to the main compound or segregation. Plaintiff told Edward to take him to segregation, but on the way, Unit Manager Neal convinced Plaintiff to go to the main compound. Plaintiff, however, changed his mind when Officer Hernandez threatened Plaintiff and Plaintiff noticed a group of inmates waiting for Plaintiff in the main compound— inmates allegedly organized by Edward "to get [Plaintiff]." Neal then sent Plaintiff to segregation.

Plaintiff fails to state a claim based on these allegations. Plaintiff does not allege that any WCFA staff members used force against him during this incident, or that the staff's alleged threats were made in retaliation for Plaintiff engaging in protected conduct. As alleged, therefore, these threats do not rise to the level of a constitutional violation. See Johnson, 357 F.3d at 546. Additionally, Plaintiff's allegation that Case Manager Edward "brought those guys from J-Unit to get [him]" (Doc. No. 16 at 10) is "pure speculation" unsupported by any facts or details, so it is not entitled to a presumption of truth. See Hill, 630 F.3d at 473 (disregarding prisoner's factually

frivolous allegation that staff would "have him assaulted and possibly killed"). And Unit Manager Neal allegedly sending Plaintiff to segregation, without more, fails to state a claim. See Joseph, 410 F. App'x at 868 ("[A]dministrative segregation alone does not involve an atypical and significant hardship implicating a protected liberty interest.").

### b. April 2022 Cell Sharing and Request for Mental Health Services

Plaintiff alleges that, in April 2022, Captain Huderson, Officer Rowe, and Lt. Warren forced him to share cells with other inmates, including by threatening Plaintiff with mace. When Warren did this on April 12, Plaintiff had been "off his meds for months," and his PTSD caused him to have a panic attack and ask Rowe for mental health services. Plaintiff told Rowe he was going to "blank out on PTSD." Rowe laughed, mocked Plaintiff, and said that mental health would not come unless Plaintiff was going to hurt himself. Plaintiff then said he was going to harm himself, and Rowe called for mental health services. Plaintiff alleges that there was a one-hour delay between requesting and receiving mental health treatment.

The allegation that Plaintiff was forced to share a cell, on its own, fails to state a claim because prisoners do not have "a constitutional right to choose [their] cellmates." See McCain, 2019 WL 2075959, at *5. And even assuming, without deciding, that being housed with these cellmates put Plaintiff at a substantial risk of serious harm, Plaintiff does not make allegations from which the Court can reasonably infer that Huderson, Rowe, or Warren knew of and disregarded that risk, as required to state a failure-to-protect claim. See Reedy, 988 F.3d at 912.

Liberally construing the Complaint in Plaintiff's favor, however, he may proceed with a claim against Officer Rowe for allegedly refusing to obtain mental health treatment in a timely manner. A prisoner's Eighth Amendment "right to be free from deliberate indifference to medical needs extends to [his] psychiatric needs." Richmond, 885 F.3d at 937 (citing Comstock, 273 F.3d

at 702). As discussed above, this claim has an objective component that requires prisoners to establish a sufficiently serious medical need, and a subjective component that requires them to establish a prison official knowingly disregarded that need. See Dominguez, 555 F.3d at 550.

For the purpose of initial review, the Court construes Plaintiff's allegation that had "been off his meds for months" at the time of this incident to mean that a physician had diagnosed Plaintiff with a psychiatric need mandating treatment. That is sufficient to satisfy the objective component at this time. See Gunther v. Castineta, 561 F. App'x 497, 502 (6th Cir. 2014) ("[Plaintiff's] mental illness qualifies as a 'serious medical need'—it was 'diagnosed by a physician' as, presumably, 'mandating treatment,' and was treated accordingly at . . . the previous facility in which [Plaintiff] was incarcerated."). And although Officer Rowe eventually called for mental health services, there was an alleged one-hour delay in which Rowe delayed treatment for non-medical reasons by laughing at and mocking Plaintiff, despite Plaintiff telling Rowe that he was going to "blank out on PTSD." At this stage in the proceedings, that is sufficient to satisfy the subjective component. See Darrah v. Krisher, 865 F.3d 361, 372 (6th Cir. 2017) ("When prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates [a] constitutional infirmity."); id. at 368–69 (citations omitted) ("Even relatively short periods of delay or neglect have sufficed."). Accordingly, Plaintiff states a claim for deliberate indifference to serious psychiatric needs against Rowe for delaying treatment following Plaintiff's alleged panic attack in April 2022.

### c.     April 2022 Placement on Mental Health Watch

Plaintiff alleges that, from April 12 to July 28, 2022, he was in seclusion on mental health watch. When he entered mental health watch, Plaintiff allegedly heard Nurse Craig say he was

24

going to put Plaintiff on medication to make Plaintiff crazy, and Dr. Kirk showed less concern for Plaintiff's mental health than inmates of other races.

These allegations fail to state a claim. As for Nurse Craig, the Sixth Circuit has recognized that state prisoners have a constitutionally protected liberty interest in refusing medical treatment, subject to regulation by prison officials that is reasonably related to the prison's interests in safety and security. See Kramer v. Wilkinson, 302 F. App'x 396, 400 (6th Cir. 2008). But Plaintiff does not allege that Craig actually prescribed him a particular medication, much less allege that Craig forced Plaintiff to take it. As alleged, therefore, Craig's overheard comment about drugs amounts to a single aggravating remark that does not rise to the level of a constitutional violation. See Johnson, 357 F.3d at 546. And Dr. Kirk's alleged racially discriminatory lack of concern is not supported by any factual allegations, so Plaintiff fails to state a claim on this basis as well. See Bishawi v. Ne. Ohio Corr. Ctr., 628 F. App'x 339, 345 (6th Cir. 2014) (citing Harden-Bey, 524 F.3d at 796) ("Conclusory equal protection claims, without specific factual allegations, are inadequate to state a civil rights claim.").

### d.    June 2022 Taking of Legal Materials

Plaintiff alleges that, while being taken to a segregation cell in June 2022, his legal materials were taken by Lt. Morris, Lt. Warren, and Captain Huderson.

This allegation fails to state a claim, for two reasons. First, to the extent that Plaintiff is attempting to bring a claim based on the "unauthorized, intentional deprivation of [his] property," such an act "does not give rise to a due process claim if the state provides an adequate post-deprivation remedy." See Weatherspoon, 2017 WL 3923335, at *3. And Tennessee "provide[s] an adequate post-deprivation remedy for takings of property." See McMillan, 136 F. App'x at 820.

Because Plaintiff does not allege that he attempted this remedy or that the remedy was inadequate, he fails to state a property-deprivation claim.

Second, to the extent that Plaintiff is attempting to bring a claim based on his right of access to the courts, he has not pleaded sufficient facts. This claim requires Plaintiff to show "actual prejudice to pending or contemplated litigation"—things like "having a case dismissed, being unable to file a complaint, and missing a court-imposed deadline." Harbin-Bey, 420 F.3d at 578 (citing Jackson v. Gill, 92 F. A'ppx 171, 173 (6th Cir. 2004)). But Plaintiff does not allege any prejudice resulting from the taking of his materials, so he fails to state an access-to-courts claim.

### e.      July 2022 Use of Force

Plaintiff alleges that, after he did not comply with an instruction to "cuff up" and go to segregation to see a doctor on July 6, 2022, Captain Huderson knocked a food tray out of Plaintiff's hand, pushed Plaintiff into the middle of the cell, and sprayed Plaintiff's "private area" with mace.

These allegations, accepted as true for the purpose of initial review, state an excessive force claim against Captain Huderson.

### f.      July 2022 Pictures of Plaintiff

Plaintiff alleges that, on July 7, 2022, Captain Huderson threatened to mace Plaintiff if Plaintiff did not allow him to take pictures of Plaintiff with Huderson's personal phone. Due to Plaintiff's PTSD, he agreed.

As presented, these allegations fail to state a claim. "A convicted prisoner maintains some reasonable expectations of privacy while in prison, but those privacy rights are less than those enjoyed by non-prisoners." Crump v. Curtis, 50 F. App'x 217, 218 (6th Cir. 2002) (citations omitted). For example, the Sixth Circuit has recognized that prisoners have a privacy right "against the forced exposure of one's body to strangers of the opposite sex." Everson v. Mich. Dep't of

Corr., 391 F.3d 737, 757 n.26 (6th Cir. 2004) (citing Cornwell v. Dahlberg, 963 F.2d 912, 916 (6th Cir. 1992); Kent v. Johnson, 821 F.2d 1220, 1226 (6th Cir. 1987)). But Plaintiff does not allege that he was forced to expose his body to Captain Huderson, so as it stands, the Court cannot reasonably infer that Huderson violated Plaintiff's privacy rights through this incident.

### g. July 2022 Disclosure of Separation List

Plaintiff alleges that he was threatened by several inmates from July 8 to 16, 2022, so he gave mental health services a list of inmates for separation. On July 16, Officer Harris allegedly gave this list to an unnamed inmate, resulting in numerous additional threats to Plaintiff.

Liberally construing the Complaint in Plaintiff's favor, he may proceed with a claim against Officer Harris based on this allegation. An Eighth Amendment failure-to-protect claim, to restate, requires a prisoner to allege that his conditions of confinement posed an objectively substantial risk of serious harm, and that a prison official subjectively knew of that risk and failed to take reasonable measures to abate it. See Reedy, 988 F.3d at 912. For the purpose of initial review, Plaintiff satisfies the objective component by alleging that he had been subject to numerous threats from other inmates for 8 days leading up to July 16, 2022. And drawing all reasonable inferences in Plaintiff's favor, Harris's knowing disregard of that risk may be established by allegedly having access to Plaintiff's separation list and giving it to another inmate without taking any steps to protect Plaintiff. Plaintiff, therefore, states a non-frivolous failure-to-protect claim against Officer Harris for giving Plaintiff's separation list to another inmate in July 2022.

### h. July 2022 Drug Test

Plaintiff alleges that, on July 18, 2022, he was drug tested because he was observed gagging and having mucus attacks when he was served prison food. Plaintiff maintains that this reaction was due to allergies, not drugs. Officer J. Jones and Officer Harris waited for the results of the test.

27

This allegation fails to state a claim. "[D]rug tests conducted under a prison policy of randomized testing pass Fourth Amendment scrutiny because they are rationally related to legitimate government interests. Non-random searches are constitutional if they are reasonable." Evans v. Vinson, 427 F. App'x 437, 443 (6th Cir. 2011) (citations omitted). This reasonableness test requires courts to "consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Bell v. Wolfish, 441 U.S. 520, 559 (1979) (collecting cases). This test also takes into account the "wide-ranging deference" that should be accorded to prison administrators "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Id. at 547 (collecting cases).

Here, beyond generally alleging that he was required to take a drug test, Plaintiff does not allege that the test was conducted in an intrusive manner. And the alleged justification for the test is not necessarily unreasonable in this context, given the substantial deference due to prison administrators in preserving internal order. Accordingly, Plaintiff fails to state a claim based on the July 2022 drug test. See May v. Trancoso, 412 F. App'x 899, 904 (7th Cir. 2011) (citations omitted) ("[C]ompelling a prisoner to urinate for a drug test while in private, with no outside spectators, under the observation of just a single male guard is neither unreasonable nor without penological justification.").

### i. July 2022 Retaliation

Plaintiff alleges that, on July 30, 2022, Officer Ammus retaliated against Plaintiff for filing a grievance two days earlier by making threats against Plaintiff to other inmates, giving Plaintiff a cold meal tray, and not allowing Plaintiff to go outside for recreation that day.

This allegation fails to state a claim. To state a retaliation claim, an inmate must allege 1) constitutionally protected conduct, 2) an adverse action that is capable of deterring a reasonable person from engaging in that conduct, and 3) causation—that the adverse act was motivated at least in part by the protected conduct. See Hill, 630 F.3d at 472. Here, although filing a grievance is protected conduct, see id., Plaintiff has not sufficiently alleged adverse action by Officer Ammus: the allegation of unspecified threats to other inmates is not supported by sufficient factual matter, see id. at 474 (evaluating whether alleged threat could be an adverse action based on the specific content of the threat); and the allegation of a single cold meal and single missed recreation period is not sufficiently adverse. See Maben, 887 F.3d at 266 (citing Thaddeus-X, 175 F.3d at 396) ("[S]ome adverse actions are so de minimis that they do not rise to the level of a constitutionally cognizable injury."). Additionally, despite the short period of time between Plaintiff filing the grievance on July 28 and Ammus's alleged actions on July 30, Plaintiff does not allege that Ammus knew about or was named in the grievance. Plaintiff's allegation of causation is thus a "conclusory allegation[] of retaliatory motive unsupported by material facts" that is not "sufficient to state a . . . claim." See Hill, 630 F.3d at 475. Plaintiff, therefore, fails to state a retaliation claim against Ammus based on this incident.

### j. July 2022 Refusal of Breakfast Trays

Plaintiff alleges that, in July 2022, Officer Wilson refused to give him breakfast twice.

This allegation fails to state a claim. The Eighth Amendment imposes a duty on prison officials to provide convicted inmates "humane conditions of confinement," which includes "adequate food." Farmer, 511 U.S. at 832–33 (collecting cases). For food to be constitutionally adequate, however, it need only be sufficient to "maintain normal health." Cunningham v. Jones, 567 F.2d 653, 660 (6th Cir. 1977). And Plaintiff does not allege that being deprived of breakfast

29

on two occasions had an adverse effect on his health. See Richmond v. Settles, 450 F. App'x 448, 456 (6th Cir. 2011) (footnote omitted) (holding that the deprivation of seven meals over six days did not violate the Eighth Amendment where the prisoner did "not allege that his health suffered as a result of the meal deprivation"). Accordingly, Plaintiff fails to state a claim on this basis.

### k.      August 2022 Retaliation

Plaintiff alleges that, on August 8, 2022, Officer Jones ordered an officer to give Plaintiff a half full meal tray with "sour odors" because Plaintiff threatened to report Jones's cousin.

This allegation fails to state a claim. Even assuming that threatening to file a non-frivolous grievance is protected conduct, see Pasley v. Conerly, 345 F. App'x 981, 984–85 (6th Cir. 2009) (holding that a prisoner threatening to file a "legitimate" grievance was conduct "arguably protected by the First Amendment"), the adverse action alleged here—giving Plaintiff a half full meal tray that smelled sour on one occasion—was "so de minimis" that it did "not rise to the level of a constitutionally cognizable injury." See Maben, 887 F.3d at 266 (citing Thaddeus-X, 175 F.3d at 396). Accordingly, Plaintiff fails to state a retaliation claim on this basis.

### l.      August 2022 Threats and Denial of Recreation

Plaintiff alleges that, on August 30, 2022, Officer Jones denied Plaintiff recreation time and threatened him by repeatedly telling him not to complain.

This allegation fails to state a claim. As noted above, verbal harassment of this kind does not rise to the level of a constitutional violation. See Johnson, 357 F.3d at 546. The same is true of the denial of recreation time on a single day. See Hobson v. Greenwood, No. 3:11-cv-00443, 2011 WL 2181318, at *2 (M.D. Tenn. June 3, 2011) ("Even construing the complaint liberally, the plaintiff's allegations regarding the lack of recreation time on a single day do not rise to level of an Eighth Amendment violation.").

30

### m.    August 2022 Phone Access

Plaintiff alleges that, in August 2022, several WCFA Officers (Love, Rowe, Harris, and J. Jones) blocked him from using the phone when he had a scheduled family call following his mother's release from the hospital and a death in the family.

This allegation fails to state a claim. The First Amendment provides prisoners a "general right to communicate with family and friends," including a right of "[r]easonable telephone access, subject to reasonable regulations." Dallas v. Chippewa Corr. Facility, No. 20-1941, 2022 WL 905857, at *3 (6th Cir. Mar. 1, 2022) (citing Washington v. Reno, 35 F.3d 1093, 1100 (6th Cir. 1994)). Here, however, Plaintiff briefly communicated with his mother and nephew on the phone, and he does not allege that he was prevented from communicating by other means, such as writing letters. Accordingly, Plaintiff fails to state a claim based on the alleged deprivation of phone access in August 2022. See id. (affirming dismissal of First Amendment phone-access claim where prisoner did "not allege facts showing that existing policies prevented him from exercising other means, such as writing letters, to communicate with others outside of" his place of confinement).

### n.    September 2022 Verbal Harassment

Plaintiff alleges that, in September 2022, Lt. Warren told another inmate that Plaintiff is a "b*t*h a**," and that she would "roll [Plaintiff] up out of here."

Plaintiff fails to state a claim on this basis because such alleged verbal harassment, while unprofessional, is not a constitutional violation. See Johnson, 357 F.3d at 546.

### 6.    CoreCivic

Having addressed Plaintiff's claims against the individual defendants, the Court returns to his claims against CoreCivic. "[P]rivate corporations cannot be held liable on the basis of respondeat superior or vicarious liability." Rouster v. Cnty. of Saginaw, 749 F.3d 437, 453 (6th

Cir. 2014) (citing Street, 102 F.3d at 818). To state a claim against a private entity like CoreCivic, Plaintiff must allege that his "'constitutional rights were violated and that a policy or custom' of [CoreCivic] 'was the moving force behind the deprivation of [his] rights." Savoie v. Martin, 673 F.3d 488, 494 (6th Cir. 2012) (quoting Miller v. Sanilac Cnty., 606 F.3d 240, 255 (6th Cir. 2010)).

As explained above, Plaintiff states several non-frivolous claims against individual staff members at TTCC and WCFA. The Court has carefully reviewed each of these claims to determine whether they implicate any CoreCivic policies or customs. And even liberally construing the Complaint, Plaintiff provides specific factual allegations from which the Court can reasonably infer a CoreCivic policy or custom related to just one of Plaintiff's remaining claims: the claim against Officer Rowe for deliberate indifference to Plaintiff's serious psychiatric needs following Plaintiff's alleged panic attack at WCFA in April 2022. Rowe allegedly told Plaintiff that he would not receive mental health services unless he said he was going to harm himself. The Court liberally construes this as an allegation that CoreCivic has a policy or custom of providing mental health treatment only to inmates who profess an intention to self-harm. For the purpose of initial review, the Court concludes that this policy or custom caused Rowe's asserted constitutional violation. Accordingly, Plaintiff may proceed with a claim for deliberate indifference to serious psychiatric needs against CoreCivic based on this incident.

### 7. Request for Transfer to a Federal Facility

Finally, Plaintiff requests transfer to protective custody at a federal prison. As neatly explained by the Eastern District of Michigan, the Court does not have authority to order this relief:

> Although in extreme cases a federal court may order state officials to transfer a prisoner to a different facility to remedy a constitutional violation, such a power does not extend to order the state to transfer a prisoner to the federal prison system, or to requiring the federal prison system to accept the prisoner. "[W]hen a state has primary custodial jurisdiction over an inmate, a federal court cannot order the delivery of the defendant for service of a sentence in a federal institution. Such an

order would be tantamount to a transfer of custody beyond the jurisdiction of the federal court." Fisher v. Goord, 981 F. Supp. 140, 176 (S.D.N.Y. 1997); see also Moore v. Schuetzle, 486 F. Supp. 2d 969, 981 (D.N.D. 2007).

Dunbar v. Caruso, No. 1:11-CV-10123-DT, 2011 WL 3474004, at *9 (E.D. Mich. July 12, 2011), report and recommendation adopted, 2011 WL 3473321 (E.D. Mich. Aug. 9, 2011). Accordingly, this request for injunctive relief will be dismissed.

## IV.     Conclusion

For these reasons, Plaintiff will be granted pauper status and this case may proceed for further development. There is a complete list of remaining claims and Defendants in the Order accompanying this Memorandum Opinion. Plaintiff should consult this Order for instructions he must follow for the case to proceed. Plaintiff is also reminded that his repeated notices, petitions, and inquiries providing updates on his conditions of confinement at WCFA have no effect in this case, and Plaintiff should refrain from submitting any similar filings going forward.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE